## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| LINDA NJU, | : | |
| Plaintiff, | : | |
| | | Case No. 3:14cv00455 |
| vs. | : | |
| | | District Judge Walter Herbert Rice |
| CAROLYN W. COLVIN, | : | Chief Magistrate Judge Sharon L. Ovington |
| Commissioner of the Social | | |
| Security Administration, | : | |
| Defendant. | : | |

## REPORT AND RECOMMENDATIONS[1]

### I.    Introduction

Plaintiff Linda Nju brings this case challenging the Social Security Administration's denial of her applications for Disability Insurance Benefits and Supplemental Security Income.  Administrative Law Judge (ALJ) Irma J. Flottman made the dispositive decision denying Plaintiff's applications.  ALJ FLottman determined that despite Plaintiff's impairments and resulting work limitations, she could still work as a mail clerk, an office helper, an information clerk, or a copy-machine operator.  Administrative Law Judge Flottman further found that a significant number of these jobs were available in the national economy and, therefore, Plaintiff was not under a benefits-qualifying disability.  (Doc. #6,

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

*PageID* #s 42-60).

The case is presently before the Court upon Plaintiff's Statement of Specific Errors (Doc. #9), the Commissioner's Memorandum in Opposition (Doc. #13), Plaintiff's Reply (Doc. #14), the administrative record (Doc. #6), and the record as a whole. Plaintiff seeks an Order reversing the ALJ's decision and remanding for an award of benefits. The Commissioner seeks an Order affirming the ALJ's decision.

## II.  Background

In her application for Disability Insurance Benefits, Plaintiff asserted that her disability began on April 4, 2008, when she was 46 years old. Her age on that date placed her in the category of a "younger person" under social security regulations. *See* Doc. #6, *PageID* #s 42, 59; *see also* 20 C.F.R. §§ 404.1563(c), 416.963(c).[2] Plaintiff later filed her application for Supplemental Security Income with a protective filing date of March 13, 2012.

Plaintiff has a "limited" education. 20 C.F.R. § 404.1564(b)(3). She worked in the past as a bank teller, loan clerk, hand packager, cashier, and truck driver.

Plaintiff focuses her contentions on the ALJ's assessment of her mental-work abilities and limitations. During the ALJ's hearing, Plaintiff testified that in her last job as an assistant manager and payday loan officer with National Cash Advance, she sometimes needed to take lump-sums of money to the bank. One day, she was "attacked and robbed

_____

[2] The remaining citations will identify the pertinent regulations for disability insurance benefits with full knowledge of the corresponding regulations for supplemental security income.

from behind." *Id*. at 78.  Ever since then, she's had nightmares and always feels like somebody is following her.  She stated, "I feel somebody's lurking around corners, watching me.  I get agitated easily, I get angry at people, just something out of the way snaps – I mean, I end up snapping at people, or I get belligerently violent with people, and you ask me 10 minutes later why I did it and I don't remember."  (Doc. #6, *PageID* #88). She explained, "I try to keep myself away from others ... because being in large crowds and groups irritates me.  I don't like noise and stuff." *Id*. at 100.  She has panic attacks daily and isolates herself in her room.  An average panic attack will last 30 to 60 minutes.  She also has crying spells 2 or 3 times per day.  She sometimes has suicidal and racing thoughts. *Id*. at 100-01.  Medication helps her symptoms subside but she still has symptoms.  She sometimes forgets to take her medications.  Her son and her sister will remind her to take them.

The lengthy administrative record (over 1,300 pages) contains much evidence concerning Plaintiff's mental and physical health, her medical treatment, and her work limitations.  Some highlights of the mental-health evidence will help place the parties' contentions in context.

Psychiatrist Dr. Walters examined Plaintiff in September 2009.  Plaintiff reported to him that she was having recurrent distressing dreams of the robbery and assault she suffered on April 4, 2008.  She also reported that she avoids activities and places that remind her of the incident (meaning the robbery), and she has "irritability and outbursts of anger,

3

difficulty falling asleep, difficulty concentrating, hypervigilence and exacerbated startle response." *Id*. at 1324.  Upon a mental-status examination, Dr. Walters noted that Plaintiff's mood was depressed, she was cooperative with him, she denied having suicidal or homicidal thoughts, and her energy level, sex drive and concentration were all decreased." *Id*.  Dr. Walters diagnosed Plaintiff with post traumatic stress disorder and major depressive disorder – single severe episode, yet without psychotic features, as a direct result of the assault and robbery. *Id*. at 325.

Plaintiff was treated at the Flexman Clinic for her mental impairments.  Her initial evaluation occurred in December 2009.  *Id*. at 727.  Therapy notes indicate that she had excessive speech that was pressured, and she was stressed out.  She continued meeting with a therapist 10 times from late December to mid-July 2010.  *Id*. at 725-27.  In early March 2010, she had excessive and ruminating speech and difficulty focusing.  In July 2010, she started vocational rehabilitation.  *Id*. at 725.

Plaintiff started treatment at Day-Mont Behavioral Health on June 17, 2011.  She was referred there for a 72-hour suicide watch following a 2-day involuntary hospitalization due to her intentional medication overdose.  *Id*. at 443, 641-42.  It appears that around the time of her hospitalization, she had been off her psychiatric medications for 2 months.  *Id*. at 582.  Upon arriving at Day-Mont Behavioral, she underwent an adult diagnostic assessment.  She reported "symptoms of bipolar disorder with mixed depression and mania."  *Id*.  She had been married twice.  Her current husband was subject to deportation and was hiding

with family members.  She has two adult children, one was deceased.  *Id*. at 436.  She lived alone. *Id*. at 435.  She reported a history of severe abuse by her father and first husband.  *Id*. at 443.

During her mental status exam, she had rapid speech and flight of ideas.  She was depressed, agitated, restless, and anxious.  *Id.* at 446.  She was diagnosed with bipolar disorder, mixed; Post Traumatic Stress Disorder; alcohol dependence; cocaine dependence in remission for 6 years; Learning Disability, NOS (not otherwise specified by the Diagnostic and Statistical Manual of Mental Disorders); and nicotine dependence.  *Id*. at 444.

During treatment sessions, Plaintiff had intense eye contact, agitated activity, and rapid speech.  Her thought processes involved flight of ideas, depressed and anxious mood, constricted affect, irritable mood, and restless behavior.  She had limited insight into her mental impairments and past treatment, and poor insight into her alcohol and drug use.  *Id*. at 446.

In August 2011, Dr. Danopulos, a physician, evaluated Ms. Nju at the request of the State agency.  In addition to the many physical problems he identified, he reported that Plaintiff been diagnosed with bipolar disorder since age 19 and anxiety in 1999.  She had been in mental health treatment intermittently since age 14.  *Id*.. at 454, 458.

Dr. Kramer, a psychologist, examined and evaluated Plaintiff in September 2011 at the request of the State agency.  Plaintiff indicated that her inability to work stemmed

5

mainly from her psychiatric impairments.  She has severe mood swings that "go up and down."  *Id*. at 594.  Dr. Kramer wrote, "She grew up with her and stepfather and brother and sister but says 'Half the time I was in a children's home.  I got beaten by my parents.  I got taken out of the house.  My brother and sister also beat me up and my mom wouldn't stop them.  I became a runaway."  *Id*. at 595.  She started seeing a psychiatrist when she was in the 4th grade.  She had one close friend in school.  She related that she had dyslexia and was in some special reading classes.  She related that she had some auditory hallucinations.  *Id*. at 597.  Dr. Kramer observed Plaintiff and noticed she was tearful at times, depressed, anxious, and somewhat unspontaneous.  *Id.*  She had problems being specific about her symptoms.  Her intelligence was judged to be in the average range.  She related that she had been raped 3 times in the past, when she was growing up.  *Id*. at 598.  Despite having a fair amount of case-management services and some benefit from her medications, Dr. Kramer found that "she still appears to be experiencing a high level of emotional distress and was hospitalized earlier this summer for a suicide attempt."  *Id*. at 599.

Dr. Kramer diagnosed Plaintiff with major depression and PTSD. Her prognosis was guarded.  Dr. Kramer noted that "she was hospitalized in June 2011 for a suicide attempt and still reports occasional suicidal thoughts and some auditory hallucinations."  *Id*.  He found her to be reliable and stated that "[h]er description of rather significant psychopathology also was consistent with the rather extensive outpatient treatment that she is apparently in."  *Id*.  Dr. Kramer also reported, "[she] does come across as being anxious

6

and describes symptoms of social anxiety and posttraumatic stress disorder. She does come across as being tearful and her coping skills and stress tolerance appear to be weak because of her depression and anxiety." *Id*. at 600. Dr. Kramer opined that Plaintiff could perform simple tasks, but her ability to perform multi-step tasks was impaired by her mental impairments. She needed "case management services in handling appointments and paperwork." *Id*. She was impaired in her ability to respond to supervision and to coworkers in a work setting, and was more impaired in this than in her other mental-work abilities. Dr. Kramer stated, "She does come across as a woman whose coping skills and ego strength are somewhat weak, especially in terms of ability to interact with others. She should, however, be able to do simple and repetitive tasks without difficulty based on her performance in today's examination. However, her ability to work in job settings where a lot of stress, cognitive complexity, or a lot of social interaction were involved would be more problematic for this claimant because of her psychological issues." *Id*. at 601.

In September 2011, psychologist Dr. Orosz reviewed the record at the request of the State agency. He found that Plaintiff had a mild restriction in her daily activities, moderate restriction in maintaining her social functioning, and moderate restriction in her ability to maintain concentration, persistence, or pace. *Id*. at 118. She was also moderately limited in her ability to (1) carry out detailed instructions, (2) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, (3) interact

appropriately with the general public, (4) and respond appropriately to changes in the work setting. *Id*. at 121-22. Dr. Orosz believed that Plaintiff was restricted to minimal contact with the general public and that she could interact with supervisors and coworkers on an occasional and superficial basis. She also needed a work environment that did not require a frequent change and did not have high production quotas. *Id*. at 122.

In January 2012, the State agency asked Dr. Lewin, a non-examining psychologist, to review the record. She opined that Plaintiff was moderately limited in the following abilities: (1) to carry out detailed instructions; (2) maintain attention and concentration for extended periods; (3) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and (4) interact appropriately with the general public, and respond appropriately to changes in the work setting. *Id*. at 136. Dr. Lewin believed that Plaintiff was restricted from work that involved detailed instructions due to her distractibility and her high level of emotional distress. Dr. Lewin also believed that Plaintiff was restricted to minimal contact with the general public and occasional interaction with supervisors and coworkers on a superficial basis. *Id*. at 137. Plaintiff "could adapt to a work environment that did not require frequent changes and high production quotas," according to Dr. Lewin. *Id*.

Meanwhile, Plaintiff had continued to receive treatment at Day-Mont Behavioral. On December 22, 2011, psychiatrist Dr. Knight saw Plaintiff in a treatment session. Dr. Knight

8

indicated that Plaintiff was still thinking about the break-up with her ex-boyfriend and wanting to set his truck on fire, but she had no intention of doing so.  *Id*. at 703.  She had racing thoughts and reported not finishing tasks.  *Id*.

On February 14, 2012, Plaintiff told a counselor that she was having "problems concentrating and keeping [her] thoughts from racing."  *Id*. at 696.  She was using thought-stopping techniques in an effort to stay focused.

Plaintiff stated, on February 28, 2012, that she was trying to stay busy to improve her mood swings.  She was overwhelmed with school but understood that it would benefit her in the future, if she "sticks with it."  *Id*. at 692.  In March 2012, Plaintiff reported that she was stressed because of school, but she was using positive self-talk "to keep going."  *Id*. at 1129.  During treatment sessions, she was observed to be cooperative yet agitated, and depressed "but [her] affect was reactive and bright."  *Id*. at 1134, 1139.  She had a constricted affect and stated that she "cries sometimes for no reason."  *Id*. at 1183.

On May 2, 2012, Plaintiff reported having a hard time focusing and had problems sleeping at night.  She was depressed, anxious, and experiencing crying spells.  *Id*. at 1137, 1139.

Plaintiff provided updated information to Day-Mont Behavioral on May 23, 2012.  She had moved in with a friend and was looking for her own apartment. She was accused of cheating and might be expelled from school.  *Id*. at 1145.  She had suicidal ideation.  She self-mutilated by cutting and digging at her skin when she was upset.  *Id*.  She was depressed

and showed both avoidant eye contact and slowed activity. *Id.* at 1149.

By June 15, 2012, Plaintiff indicated that she "didn't think anything will help at this point. Her medications were not working, and she was "too stressed to use the skills." *Id.* at 1156. She was "living day to day," and she noted, "It is easy to say what I will do but hard to follow through when there are so many other problems." *Id.*

Plaintiff's treating psychiatrist Dr. Patel completed a questionnaire on February 4, 2013. She had seen Dr. Patel every 2 or 3 months since February 20, 2012. Dr. Patel diagnosed Plaintiff with bipolar 1 disorder, recurrent and mixed; alcohol dependence and cocaine dependence in full and sustained remission. Dr. Patel indicated that Plaintiff's signs and symptoms included appetite and sleep problems, mood disturbances, emotional liability, paranoia, recurrent panic attacks, anhedonia or pervasive loss of interests, paranoia or inappropriate suspiciousness, decreased energy, racing thoughts, difficulty thinking and concentrating, 2 suicidal attempts, generalized persistent anxiety, and hostility and irritability. *Id.* at 1216. Dr. Patel observed that Plaintiff appeared anxious with mild lability. Her prognosis was guarded. *Id.* at 1217. Dr. Patel believed that Plaintiff's condition was expected to last more than 12 months , and her psychiatric condition could lower her pain threshold. *Id.* Her psychiatric condition would cause her to be absent more than 3 times a month. As to her mental-work limitations, Dr. Patel opined that Plaintiff had a moderate restriction in her daily activities and social functioning, and marked impairment in concentration, persistence, or pace and marked impairments in her episodes of deterioration

10

or decompensation at work.  *Id*.  He also wrote, "Due to chronic anxiety, mood lability, trouble being around people and back pain, she is unlikely to work 40 hours/week."  *Id*. at 1218.

A detailed description of Plaintiff's remaining medical records and medical-opinions is unnecessary because the undersigned has reviewed the entire administrative record and because Plaintiff, the Commissioner, and the ALJ have discussed and referred to the pertinent records in great detail.

### III.    "Disability" Defined and the ALJ's Decision

To be eligible for Disability Insurance Benefits (DIB) or Supplemental Security Income (SSI) a claimant must be under a "disability" within the definition of the Social Security Act.  *See* 42 U.S.C. §§ 423(a), (d), 1382c(a).  The definition of the term "disability" is essentially the same for both DIB and SSI.  *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).  Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies.  *See Bowen*, 476 U.S. at 469-70 (1986).

To determine whether Plaintiff was under a benefits-qualifying disability, ALJ Flottman applied the Social Security Administration's 5-Step sequential evaluation procedure.  *See* 20 C.F.R. § 404.1520(a)(4).  She found at Steps 1 through 3, respectively,

that Plaintiff had not engaged in substantial paid work since April 4, 2008, the date she allegedly became disabled; she had severe mental impairments of "learning disorder (dyslexia), affective (mood) disorder, anxiety disorder...."; and did not automatically qualify for benefits at Step 3.  (Doc. #6, *PageID* #s 45, 52).

At Step 4, the ALJ assessed Plaintiff's mental residual functional capacity or the most she could do in a work setting despite her impairments.[3]  As to her mental-work limitations, the ALJ found Plaintiff "limited to performing simple, routine, and repetitive tasks of a low-stress nature (i.e., no production rate or pace work).  She should have not contact with the general public and no more than occasional interaction with co-workers."  *Id*. at 53.  With these, and considering Plaintiff's physical-work limitations, the ALJ also found that Plaintiff could not perform her past relevant jobs.

At Step 5, as noted previously, the ALJ found that Plaintiff could perform a significant number of jobs that exist in the national economy.  In the end, the ALJ's sequential findings led her to ultimately conclude that Plaintiff was not under a benefits-qualifying disability.

## IV.  <u>Judicial Review</u>

The Social Security Administration's denial of Plaintiff's applications for benefits – embodied here in ALJ Flottman's decision – is subject to judicial review along two lines: whether the ALJ applied the correct legal standards and whether substantial evidence

---

[3] *See* 20 C.F.R. §404.1545(a); *see also Howard v. Commissioner of Social Sec.*, 276 F.3d 235, 239 (6th Cir. 2002).

supports the ALJ's findings.  *Blakley v. Comm'r of Social Sec.*, 581 F.3d 399, 405 (6th Cir. 2009); *see Bowen v. Comm'r of Social Sec.*, 478 F3d 742, 745-46 (6th Cir. 2007). Reviewing the ALJ's legal criteria for correctness may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings.  *Rabbers v. Comm'r of Social Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F3d at 746.

The substantial-evidence review does not ask whether the Court agrees or disagrees with the ALJ's factual findings or whether the administrative record contains evidence contrary to those factual findings.  *Rogers v. Comm'r of Social Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her*, 203 F.3d at 389-90.  Instead, substantial evidence supports the ALJ's factual findings when "a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'"  *Blakley*, 581 F.3d at 406 (quoting *Warner v. Comm'r of Social Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)).  Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance..."  *Rogers*, 486 F.3d at 241.

**V.    <u>Discussion</u>**

Plaintiff argues that the ALJ erred by rejecting the opinions of her treating psychiatrist Dr. Patel and by instead relying on the opinions provided by the record reviewers Dr. Orosz and Dr. Lewin as well as the opinions of one-time examiner Dr. Kramer.  The Commissioner counters that substantial evidence supports the ALJ's decision to place no weight on Dr. Patel's opinions, including Dr. Patel's mostly normal findings, mental-health counselor Ms. Hicks's findings, Dr. Kramer's observations, and the opinions

13

provided by Drs. Orosz and Lewin.

Social security regulations recognize several different types of medical sources: treating physicians and psychologists, nontreating/examining physicians and psychologists, and nontreating/record-reviewing physicians and psychologists. *See* 20 C.F.R. §§ 404.1527(c), (e). "The regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." Social Security Ruling No. 96–6p, 1996 WL 374180, at *2 (July 2, 1996)).  The strongest ties potentially arise between a treating-medical source and his or her patient.  This is reflected in the treating physician rule, which requires ALJs to apply controlling weight to a treating-medical source's opinion when it is (1) "well supported by medically acceptable clinical and laboratory diagnostic techniques," and (2) "is not inconsistent with other substantial evidence in [a claimant's] case record."  20 C.F.R. §404.1527(c)(2)); *see Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 723 (6th Cir. 2014).  If both conditions do not exist, the treating physician or psychologist's opinions are not due controlling weight under the treating physician rule.

"Even when not controlling, however, the ALJ must consider certain factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability of the physician's conclusions; the specialization of the physician; and any other relevant factors.  In all cases, the treating physician's opinion is entitled to great deference even if it is not controlling." *Gentry*, 741 F.3d at 723 (citing *Rogers*, 486 F3d at

14

242).

The opinions of non-treating medical sources – record-reviewing physicians, one-time examiners, and the like – "are never assessed for controlling weight." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 363, 376 (6th Cir. 2013). The ALJ "instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling. Other factors 'which tend to support or contradict the opinion' may be considered when assessing any type of medical opinion." *Id*. (citation omitted); *see* Soc. Sec. Rul. 96-6P, 1996 WL 374180 at *2.

The ALJ wholly rejected Dr. Patel's opinions that Plaintiff was markedly limited in some areas of her mental-work abilities. The ALJ held that the marked limitations Dr. Patel identified "are neither well supported by medically acceptable clinical and laboratory diagnostic techniques nor consistent with the other substantial evidence in the case record." (Doc. #6, *PageID* #50). The ALJ also rejected Dr. Patel's opinion that Plaintiff was moderately limited in other areas of her mental-work abilities. Doing so, the ALJ largely relied on the opinions and information provided by one-time examiner Dr. Kramer and by record reviewers Drs. Orosz and Lewin. *Id*. at 50-52, 55-56. The ALJ's decision to favor these non-treating medical source opinions over Dr. Patel's opinions is flawed in several ways.

First, the ALJ did not weigh the opinions provided by either Dr. Kramer or Dr. Orosz

or Dr. Lewin under any of the factors required by the regulations.  Although the ALJ was not required to discuss each regulatory factor as to each of their opinions, the ALJ did not indicate why their opinions were due more weight under the regulations than Dr. Patel's opinions.  Without some reference to the factors upon which she relied, the ALJ's decision suggests her blind acceptance of their opinions.  Such an approach cannot be reconciled with the regulations or Ruling 96-6p's recognition of the "progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker."  1996 WL 374180, at *2.

Second, the ALJ erred by subjecting treating psychiatrist Dr. Patel's opinions to greater scrutiny than the opinions provided by the non-treating medical sources.  " [T]he regulations do not allow the application of greater scrutiny to a treating-source opinion as a means to justify giving such an opinion little weight.  Indeed, they call for just the opposite." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 380 (6th Cir. 2013).

Third, even if it assumed (in the Commissioner's favor) that the ALJ properly declined to apply the treating physician rule, the ALJ erred by not discussing what factors led her to conclude that no deferential weight was due Dr. Patel's opinions.  *See Gentry*, 741 F.3d at 72; *see also Gayheart* v. Comm'r of Soc. Sec., 710 F.3d 363, 376 (6th Cir. 2013). And, the main reasons that ALJ provided are not supported by substantial evidence.  The ALJ stated that Dr. Patel's findings about Plaintiff's limitations "could only be based on uncritical acceptance of the claimant's subjective complaints (which psychologist Dr.

Kramer viewed with incredulity)."  (Doc. #6, *PageID* at 50).  Yet, Dr. Patel identified many

signs and symptoms Plaintiff exhibited.  *Id*. at 1216.  The ALJ assumes too much by finding

that Plaintiff's signs and symptoms were based "only" on Dr. Patel's uncritical acceptance

of Plaintiff's reports.  It is equally or even more likely that Dr. Patel identified these findings

based on his observations of Plaintiff during his treatment sessions with her.  Symptoms

such as Plaintiff's mood disturbances, emotional lability, anhedonia or pervasive loss of

interests, paranoia or inappropriate suspiciousness, and hostility and irritability can be

exhibited and identified by a psychiatrist free from an uncritical acceptance of subjective

statements by Plaintiff.  One common-sense example suffices: A person can exhibit hostility

and irritability though her body language, demeanor, or physical action without verbally

expressing subjective complaints of hostility and irritability.  It is simply too much to

assume, as the ALJ did, that the Dr. Patel uncritically – and "only" – accepted Plaintiff's

subjective reports when identifying Plaintiff's signs and symptoms.  Dr. Patel, moreover,

indicated elsewhere that Plaintiff appeared anxious with mild lability and was paranoid

when around people.  *Id*. at 1217.  Such observations were consistent with other signs and

symptoms Dr. Patel identified, rather than an uncritical acceptance of her self-reported

symptoms.  Substantial evidence also fails to support the ALJ's characterization of Dr.

Kramer's "incredulity" concerning Plaintiff.  Quite the opposite emerges from Dr. Kramer's

report, despite a bit of equivocation, where he writes:

> **Reliability Estimate**
> Overall the claimant appears to be a reliable informant.  She seemed to be

> honest in sharing information, although she tended to be a little vague. She
> had difficulty being very specific about some of her symptoms and their
> impact upon her functioning but the information that she provided overall
> appeared to be consistent with the clinical impression obtained in today's
> interview. Her description of rather significant psychopathology also was
> consistent with the rather extensive outpatient treatment she is apparently in.

*Id*. at 599.

The ALJ's fourth misstep occurred when she overemphasized that Dr. Patel, a

psychiatrist, referred to Plaintiff's back pain as a reason to conclude she was unlikely to

work 40 hours per week. The ALJ rejected this conclusion as "purely speculative" because

Dr. Patel treated Plaintiff's mental impairments not her physical impairments. The problem

here is that Dr. Patel did a lot more than state that Plaintiff's back pain was work preclusive.

Dr. Patel's reference to back pain was only one of several problems he listed in support of

his belief that Plaintiff was unlikely to work a 40-hour week. Dr. Patel wrote, "Due to

chronic anxiety, mood lability, trouble being around people and back pain, she is unlikely to

work 40 hours/week." *Id*. at 1218. Given the combination of these problems, it was not

"purely speculative" for Dr. Patel to reach his work-preclusive conclusion even though he

identified back pain as one problem. This is particularly so because Dr. Patel elsewhere

indicated that Plaintiff's psychiatric condition "can lower [Plaintiff's] pain threshold." *Id*. at

1217. Dr. Patel, therefore, was not considering Plaintiff's back pain as a solely physical

problem. He viewed it as psychologically connected to her mental-health symptoms such

that the combination of her impairments made it unlikely she would return to work. As a

result, Dr. Patel reasoned within his area of expertise, and the ALJ's finding that he was

18

engaged in pure speculation was simply wrong and unsupported by substantial evidence.

The ALJ lastly erred by relying on medical records, including Dr. Patel's records, that Plaintiff's Global Assessment of Functioning was in the moderate range.  "The Commissioner has declined to endorse the [GAF] score for 'use in the Social Security and [SSI] disability programs,' and has indicated that [GAF] scores have no 'direct correlation to the severity requirements of the mental disorders listings.'"  *DeBoard v. Comm'r of Soc. Sec*., 211 F. App'x 411, 415 (6th Cir. 2006) (quoting, in part, *Wind v. Barnhart,* No. 04–16371, 2005 WL 1317040, at *6 n. 5, 133 Fed. App'x 684 (11th Cir. June 2, 2005) (quoting 65 Fed. Reg. 50746, 50764–65 (Aug. 21, 2000)).  The Commissioner contends, "[T]he ALJ was free to cite GAF scores as among the substantial evidence contradicting Dr. Patel's opinions." (Doc. #13, *PageID* #1414).  This contention, and the cases upon which it rests, *see id*. at 1414-15, does not address the more specific problem arising from the Commissioner's decision not to use the [GAF] score for 'use in the Social Security and [SSI] disability programs ....'"  *DeBoard*, 211 Fed. App'x at 415 (citations omitted).  In addition, the fifth and most recent edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM-5) has dropped the GAF.  "DSM-5 explains that the GAF was excluded for several reasons, among which were its lack of conceptual clarity (*i.e*., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice." DSM-5 and the Assessment of Functioning: The World Health Organization Disability Assessment Schedule 2.0, J. Am Acad. Psychiatry and Law, 42: 2: 173-181 (June

19

2014) (footnote omitted) (available at http://www.jaapl.org. Search by article title).

Although the GAF scale was in use at the time of the ALJ's decision, its more recent

rejection by the psychiatric professionals who created it and its lack of direct correlation

with the requirements of the Commissioner's mental disorders listings cast too dark a

shadow over its use as a reason to reject a treating psychiatrist's opinions.

Accordingly, Plaintiff's challenges to the ALJ's weighing of the medical source

opinions are well taken.[4]

## VI.    Remand is Warranted

Remand is warranted when the ALJ's decision is unsupported by substantial evidence

or when the ALJ failed to follow the Administration's own regulations and that shortcoming

prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial right.  *Bowen*,

478 F3d at 746.  Remand for an ALJ's failure to follow the regulations might arise, for

example, when the ALJ failed to provide "good reasons" for rejecting a treating medical

source's opinions, *see Wilson*, 378 F.3d at 545-47; failed to consider certain evidence, such

as a treating source's opinions, *see Bowen*, 478 F3d at 747-50; failed to consider the

combined effect of the plaintiff's impairments, *see Gentry*, 741 F.3d at 725-26; or failed to

provide specific reasons supported by substantial evidence for finding the plaintiff's

credibility lacking, *Rogers,* 486 F.3d at 249.

---

[4] In light of the above discussion, and the resulting need to remand this case, an in-depth analysis of Plaintiff's challenge to the ALJ's credibility determination or Plaintiff's submission of additional evidence is unwarranted.

Under sentence 4 of 42 U.S.C. §405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand under sentence 4 may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994). The latter is warranted "only where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is lacking." *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994) (quoting *Faucher v. Sec'y of Health & Humans Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

A remand for an award of benefits is unwarranted in the present case because the evidence of disability is not overwhelming and because the evidence of disability is not strong while contrary evidence is weak. *See Faucher*, 17 F.3d at 176. Yet, Plaintiff is entitled to an Order remanding this matter to the Social Security Administration pursuant to sentence 4 of §405(g) due to problems set forth above. On remand the ALJ should be directed to review Plaintiff's disability claim to determine anew whether she was under a benefits-qualifying disability under the applicable 5-Step sequential evaluation procedure, including, at a minimum, a re-assessment of Plaintiff's mental impairments and her residual functional capacity, and a re-consideration of the evidence at Step 5 of the sequential evaluation.

**IT IS THEREFORE RECOMMENDED THAT:**

1.      The Commissioner's non-disability determination be vacated;

2.      No finding be made as to whether Plaintiff Linda Nju was under a "disability" within the meaning of the Social Security Act;

3.      The case be remanded to the Social Security Administration pursuant to Sentence 4 of 42 U.S.C. §405(g) for further consideration consistent with this Report and a Decision and Entry adopting this Report; and

4.      The case be terminated on the docket of this Court.

January 7, 2016

                                              s/Sharon L. Ovington
                                         Sharon L. Ovington
                                 Chief United States Magistrate Judge

22

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(d), this period is extended to **SEVENTEEN** days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F).  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947, 949-50 (6th Cir. 1981).